IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BRIAN HUTTNER,             :
        *Plaintiff*,

                          :        CIVIL ACTION
    v.                             NO. 19-18907

                          :

OSSUR AMERICAS, INC. AND JOHN
DOES 1-5 AND 6-10,        :
        *Defendants*.     :

**November 2, 2022**

**Jones, II  J.**

## **MEMORANDUM**

### I.       INTRODUCTION

Brian Huttner ("Plaintiff") worked for Ossur Americas ("Defendant") as a distribution

clerk in their Paulsboro, New Jersey facility. Plaintiff initiated this action, alleging disability

discrimination, perceived disability discrimination, disability harassment, retaliation, and a

request for equitable relief under the New Jersey Law Against Discrimination ("NJLAD").[1]

Defendant has moved for Summary Judgment on all of Plaintiff's claims, arguing that he was

terminated based on his poor workplace behavior and that any comments he was subjected to do

---

[1] As a preliminary matter, the Court must address whether it has subject matter jurisdiction over the above-captioned case. Defendant invoked diversity jurisdiction when removing, Notice of Removal ¶ 5 (ECF No. 1), which requires both diversity of citizenship and an amount in controversy exceeding $75,000. *See* U.S.C. § 1332(a). Although Plaintiff does not dispute the amount in controversy, courts have a "continuing obligation" to "dismiss a suit *sua sponte* for lack of subject matter jurisdiction at any stage in the proceeding." *Zambelli Fireworks Mfg. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010) (citing *Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir. 1977)). In the case at bar, the Court is satisfied that the removing Defendant has carried its burden in meeting the amount-in-controversy requirement. Where, as here, the Plaintiff's complaint does not include a specific monetary demand, and Plaintiff does not challenge the amount-in-controversy, the removing Defendant need only "plausibly allege" the amount-in-controversy. *See Yucis v. Sears Outlets Stores*, 813 F. App'x 780, 789 n.2 (3d Cir. 2020) (citing *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014)). Here, Plaintiff seeks "compensatory damages, punitive damages, interest, cost of suit, attorneys' fees, enhanced attorneys' fees, equitable back pay, equitable front pay, equitable reinstatement, and any other relief the Court deems equitable and just." Compl. 8. Since Defendant cites these allegations as its basis for satisfying the amount-in-controversy, the Court thinks it is plausible that the value of Plaintiff's claims exceeds $75,000, so subject-matter jurisdiction is established accordingly. Notice of Removal, ¶ 6, ECF No. 1.

not rise to the level of harassment as defined by both New Jersey and federal employment discrimination jurisprudence. For the reasons set forth below, Defendant's Motion for Summary Judgment (ECF No. 24) (hereinafter "Motion") is granted in its entirety.

## II.      FACTUAL BACKGROUND

### A.  Defendant Hires Plaintiff

Plaintiff began working for Defendant as a temporary employee around February 2015, before being hired by the company to a full-time position as a distribution clerk on July 24, 2015. SMF ¶¶ 4, 8 (ECF No. 24-1); RSMF ¶¶ 4, 8 (ECF No. 26).[2] As a distribution clerk, Plaintiff was responsible for operating a cherry picker, handling merchandise, placing merchandise on shelves, using a reach truck to place full pallets of freight on a tall shelf, and picking up orders for customers on occasion. SMF ¶ 10; RSMF ¶ 10. During both his tenure as a temporary and full-time employee, Plaintiff had a moderate-severe stuttering condition, SMF ¶¶ 7, 9; RSMF ¶¶ 7, 9; CMF ¶ 6; RCMF ¶ 6, which was apparent to Defendant's management. CMF ¶ 7; RCMF ¶ 7. Throughout his employment, Plaintiff was supervised by Warehouse Manager Jim Regalbuto ("Mr. Regalbuto") and Warehouse Supervisor Mike McCleaft ("Mr. McCleaft"). SMF ¶ 12; RSMF ¶ 12.

### B.  Derogatory Comments by Co-workers

For the first two (2) years of his employment, Plaintiff's co-workers did not make derogatory remarks about his stutter. SMF ¶ 13; RSMF ¶ 13. Around mid-2017, Chris Ledric ("Mr. Ledric"), a distribution clerk, asked Plaintiff "did [he] get picked on a lot as a kid." SMF ¶

---

[2] For purposes of this discussion, this Court shall refer to Defendant's Statement of Material Facts (ECF No. 24-1) as "SMF," Plaintiff's Response thereto (ECF No. 26) as "RSMF," Plaintiff's Counterstatement of Material Facts (ECF No. 26) as "CMF," Defendant's Response thereto (ECF No. 29-1) as "RCMF."

14; RSMF ¶ 14. When Plaintiff responded in the affirmative, Mr. Ledric stated that it "must come with the territory." SMF ¶ 14; RSMF ¶ 14; CMF ¶¶ 16–17; RCMF ¶¶ 16–17.

Around this same time, Scott Essex ("Mr. Essex"), also a distribution clerk, asked Plaintiff a question, and when Plaintiff stuttered when answering, Mr. Essex rolled his eyes, waved his hand, and stated, "Come on, hurry up; I don't have all day." SMF ¶ 15; RSMF ¶ 15; CMF ¶¶ 13–14; RCMF ¶¶ 13–14. Sometime in 2017, Plaintiff had a conversation with Mr. McCleaft where he expressed "concerns about being harassed and made fun of . . ." SMF ¶ 16; RSMF ¶ 16. Mr. McCleaft told Plaintiff that he was a "valuable employee," and "not to let little things like that affect [his] work performance." SMF ¶ 17; RSMF ¶ 17. However, Plaintiff was not aware if Mr. McCleaft spoke with Mr. Ledric or Mr. Essex about their comments to him. SMF ¶ 18; RSMF ¶ 18.

Another incident occurred during a meeting in 2018, where Mr. Ledric commented that Plaintiff should read the "safety topic for that week." SMF ¶ 19; RSMF ¶ 19; CMF ¶ 18; RCMF ¶ 18. Mr. Essex responded to Mr. Ledric's comment, saying "Yeah, we should make [Plaintiff] read it so it takes us all day and we don't have to do any work this whole day . . . That will take us until 2:30." SMF ¶ 20; RSMF ¶ 20; CMF ¶ 19; RCMF ¶ 19. After this meeting, Plaintiff spoke with Mr. McCleaft about the comments, and Mr. McCleaft told him to "keep working, just to–to let things like that . . . roll off [his] chest." SMF ¶ 21; RSMF ¶ 21.  Additionally, Mr. McCleaft advised him to call the Human Resources Department about his concerns. SMF ¶ 22; RSMF ¶ 22.

Around July 26, 2018,[3] Plaintiff called Elisa Casteneda ("Ms. Castaneda"), Defendant's Director of Human Resources Americas, "expressing [his] concerns about being made fun of and

---

[3] The Court notes that the parties agreed to two different dates for Plaintiff's last complaint to Ms. Castaneda. Both Plaintiff and Defendant agree that Plaintiff's last complaint was around June 2018, SMF ¶ 24; RSMF ¶ 24, and on or

harassed by people that [he] worked with." SMF ¶ 24; RSMF ¶ 24; CMF ¶ 47; RCMF ¶ 47. Specifically, Plaintiff identified Mr. Essex and Mr. Ledric as the ones making comments. SMF ¶¶ 25–26; RSMF ¶¶ 25–26.

At no point did Plaintiff put any of his concerns regarding his co-workers' derogatory comments in writing to Mr. McCleaft, Ms. Castaneda, or anyone else. SMF ¶¶ 23, 27; RSMF ¶¶ 23, 27. Besides the two (2) conversations with Mr. McCleaft and one (1) conversation with Ms. Castaneda, Plaintiff did not make any other complaints to Defendant's management. SMF ¶ 28; RSMF ¶ 28.

At some point after Plaintiff's verbal complaint to Ms. Castaneda, Brian Julian ("Mr. Julian"), another distribution clerk, told Plaintiff that he was applying for a job in the prosthetic room. SMF ¶ 29; RSMF ¶ 29. Plaintiff asked Mr. Julian "what the job was" and where he could apply for it, to which Mr. Julian told Plaintiff "not to bother" applying for the job "cause it would require speaking to customers on the phone." SMF ¶¶ 30–31; RSMF ¶¶ 30–31. Rosalina Placido ("Ms. Placido"), a distribution clerk, overheard Mr. Julian's comment and told Plaintiff that "[y]ou don't want to put yourself through that, Brian" SMF ¶ 32; RSMF ¶ 32. Plaintiff did not speak to anyone in management about the job and did not apply for the position. SMF ¶ 33; RSMF ¶ 33; CMF ¶ 23; RCMF ¶ 23.

**C.  Plaintiff's Alleged Misconduct Results in a Final Written Warning**

In addition to claims that he was mistreated by his co-workers, Plaintiff is also alleged to have engaged in his own misconduct, culminating in Defendant issuing Plaintiff a final written warning. SMF ¶¶ 35–38; RSMF ¶¶ 35–38. After receiving input from Ms. Castaneda, Mr.

---

around July 26, 2018. CMF ¶ 47; RCMF ¶ 47. Construing the facts in the manner most favorable to Plaintiff, the Court adopts the July 26 date for Plaintiff's last complaint. Accordingly, there was a five-month gap between Plaintiff's last complaint and his termination.

McCleaft provided a finalized copy of Plaintiff's final written warning to Ms. Castaneda on July 24, 2018. SMF ¶¶ 35–38; RSMF ¶¶ 35–38. The final written warning detailed Plaintiff's "lack of professionalism, maturity and disrespect shown towards others, specifically to some members of the leadership team," and added that Plaintiff had neither "been acting in accordance with [Defendant's] value(s)" nor "meeting performance expectations." SMF ¶ 39; RSMF ¶ 39. Particularly, the final written warning listed the following eight (8) incidents as the basis for the warning:

1. A co-worker reported that Plaintiff made statements insinuating that the co-worker was a pedophile, making statements that he was "going to watch little girls play soccer."

2. A co-worker complained that Plaintiff was "speeding through intersections and not utilizing the horn."

3. On June 2, 2018, Mr. McCleaft communicated to Plaintiff and others that the temporary shift no longer meets the business needs and that everyone would be required to work their originally assigned shift. Plaintiff expressed "a disgruntled behavior" and tried to coax co-workers into saying that his shift should be earlier.

4. Mr. McCleaft had discussions with Plaintiff about not clocking in fifteen (15) minutes early to his shift, but during the dates of May 21, 2018 to May 24, 2018, Plaintiff continued to clock in an additional fifteen (15) minutes early.

5. Plaintiff referred to his Department Lead as "Hulk Hogan's wife".

6. Mr. McCleaft discussed with Plaintiff about ensuring that his handheld is returned to the department at the end of his shift, yet Mr. McCleaft had to remove the

company's handheld from his personal locker twice. Most recently, Plaintiff left the handheld on a forklift instead of returning it to the department.

7. A random locker check led by the leadership team found a large stock of Defendant's PPE in Plaintiff's locker. These supplies were for everyone's use and keeping them in a personal locker was a "direct violation of the code of conduct and is considered stealing of company property."

8. The department lead approached Mr. McCleaft and told him that Plaintiff had been "verbally accusing her to other employees of stealing personal items from [Plaintiff's] locker."

*See* SMF ¶ 40; RSMF ¶ 40; Employee Disciplinary Notice, attached to Mot. as Ex. E (hereinafter "Def.'s Ex. E").[4]

Based on these incidents, the final written warning stated that Plaintiff violated Defendant's Standards of Conduct. SMF ¶ 41; RSMF ¶ 41; Def.'s Ex. E.[5] Further, the final written warning noted that Plaintiff's "failure to adhere to [Defendant's] expectation may result in further disciplinary action up to and including termination." SMF ¶ 42; RSMF ¶ 42. Both Mr.

---

[4] Although Plaintiff challenges the accuracy of the incidents upon which the final written warning was based, the Court is merely admitting that the final written warning stated these reasons as the basis for the warning, not that these incidents actually occurred. Further, Plaintiff objects to these incidents as hearsay pursuant to Federal Rule of Evidence 802. RSMF ¶ 40. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *Gonzalez v. Sec'y of Dept. of Homeland Sec.*, 678 F.3d 254, 262 (3d Cir. 2012) (quoting F.R.E. 801(c) advisory committee's note); *see also Anderson v. United States*, 417 U.S. 211, 219–20 (1974) (holding that statements are non-hearsay when "the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false."). Here, Defendant only includes the statements from the final written warning—and the Court only admits them insofar as—to demonstrate that the final written warning stated these incidents as its basis for reprimanding Plaintiff. Because the Court does not consider the statements for their truth, they cannot be hearsay, and Plaintiff's objection are overruled.
[5] Plaintiff also denies this fact and objects to it as hearsay pursuant to Federal Rule of Evidence 802. However, for the reasons noted above, this fact is admitted insofar as it admits that the final written warning states that Plaintiff violated the company's policies, not that he violated them. *See supra* note 4.

6

McCleaft and Ms. Castaneda testified that Plaintiff was issued the final written warning by Mr. McCleaft, while Ms. Castaneda was present over the telephone. SMF ¶ 44; RSMF ¶ 44.

### D.  Parker Complains of Plaintiff's Allegedly Inappropriate Conduct

On November 29, 2018, employee Danielle Parker ("Ms. Parker") made a verbal and written complaint about the conduct of Plaintiff and another employee, John Regan ("Mr. Regan"), to Laura Din ("Ms. Din"), Defendant's Human Resources Business Partner. SMF ¶¶ 47–48; RSMF ¶¶ 47–48; *see* Parker's Written Complaint, attached to Plaintiff's Response in Opposition to Summary Judgment (hereinafter "Response") as Ex. I (hereinafter "Ex. I"). Ms. Din emailed Mr. Regalbuto, Plaintiff's Warehouse Manager, and Ms. Castaneda, advising them that Ms. Parker contacted her, claiming that "she is being harassed" by Plaintiff. SMF ¶ 48; RSMF ¶ 48; *see* Din's Emails on Parker, attached to Resp. as Ex. J (hereinafter "Ex. J"). Further, Ms. Parker alleged that, around five (5) weeks prior to her complaint, she was "a little confused" by something Plaintiff said to her, and Plaintiff responded with, "hahaha I guess she didn't get what I was talking about—awkward."[6] SMF ¶ 51; RSMF ¶ 51; Ex. I.[7] Parker's complaint goes on to allege that "over the last few weeks, every time he sees me in the lunchroom, he says "'awkward awkward' really loud . . . ." Ex. I. She also noted that Mr. Regan told her that it "looks like [she] gained some weight while [he] was gone on vacation." CMF ¶ 89; RCMF ¶ 89; Ex. I; Ex. J. At the time of Ms. Parker's complaint, Mr. Regan was on a final written warning

---

[6] Plaintiff also denies this fact as articulated in Defendant's SMF ¶ 51. However, for the reasons previously addressed, this fact is admitted insofar as it establishes that Parker stated these incidents in her complaint, not that these incidents are factually true. *See supra* note 4.

[7] Regarding the particulars of the conversation between Ms. Parker and Plaintiff, Ms. Parker's complaint stated: "About 5 weeks ago or so, [Plaintiff] had come up to me when I was by the microwave and asked me 'Hey did they make you the boss yet?' I was very confused on why that would ever be a comment, but I replied with 'No, why would they?' He said, 'oh well now that you're in there so I figured they would.' (Since I've been working in the prosthetic room.) I said 'No, I just wanted to be trained in everything and I was given a great opportunity to learn more, so that's what I'm doing.' He said 'Oh, well I guess keep doing what your [sic] doing.' As he laughed, I said 'thanks' but I was a little confused, he then said 'hahaha I guess she didn't get what I was talking about— awkward.'" Ex. I.

that was issued on May 12, 2016—two (2) and a half years prior to Ms. Parker's complaint—for a safety/confrontation issue with a co-worker. Ex. J; Ex. I; Def.'s Ex. G.

### E.  Din Investigates Plaintiff's Conduct

After receiving Ms. Parker's complaint and written statement, Ms. Din investigated her allegations against both Plaintiff and Mr. Regan. SMF ¶ 53; RSMF ¶ 53. During her investigation, Ms. Din interviewed a number of employees, including: Dominique Harold, Elaine Sosnoski, Gina Roman, David Shirley, Ronald Wharton, and Christopher O'Malley. SMF ¶ 54; RSMF ¶ 54. Ms. Sosnoski allegedly heard the comment "so you are the boss now" and added that "[Plaintiff] is constantly making comments, stupid stuff out loud, awhile ago I was two minutes late and [Plaintiff] kept saying 2, 2, 2 when I would pass him." SMF ¶ 55; RSMF ¶ 55; *see* Witness Interview Statements, attached to Resp. as Ex. G (hereinafter "Pl.'s Ex. G"). Ms. Din's investigation also notes that Ms. Roman saw Ms. Parker being made uncomfortable at work, and she witnessed Plaintiff make "little comments like 'awkward.'" SMF ¶ 56; RSMF ¶ 56; Pl.'s Ex. G. Ms. Roman went on to state that "I have no idea what it means[,] but I have heard it twice. As a lead, Danielle has come to me on a constant basis with concerns this is happening at least 3x per week." Pl.'s Ex. G. In addition to these interviews, Ms. Din also received an email statement from employee Magdaline Rivera which stated, "I have heard several weeks ago, someone saying Awkward out loud[,] and most of the guys started to laugh. I didn't know who they were referring to." SMF ¶ 57; RSMF ¶ 57; Pl.'s Ex. G.

### F.  Plaintiff's Termination

After conducting the investigation, Ms. Din recommended that Plaintiff be terminated, and on December 4, 2018, Defendant terminated Plaintiff's employment. SMF ¶ 58, 60; RSMF ¶ 58, 60. Unlike Plaintiff, Mr. Regan was interviewed before being disciplined because Plaintiff's

conduct was "repeated and unwanted" while Mr. Regan admitted to making an "isolated comment." SMF ¶ 59; Dep. of Laura Din 111:21–112:22, attached to Resp. as Ex. B (hereinafter "Ex. B").[8] Plaintiff testified, "I just feel that my termination should not have happened, and if I did not have a stuttering disability, I would still be there today." SMF ¶ 63; RSMF ¶ 63. Additionally, Plaintiff stated, "I just think that members of management and members of HR didn't want somebody with a stuttering disability working at [their facility]." SMF ¶ 63; RSMF ¶ 63. Plaintiff further claimed that the reasons provided for his termination (i.e. Ms. Parker's complaint) "seemed like it—it seemed like it was something that was made up," and that as a result of his complaint to Ms. Castaneda in June of 2018, he felt that "HR had to go on some kind of defensive and make up some kind of a plan that would result in my—my termination." SMF ¶ 68; RSMF ¶ 68.

## III.   PROCEDURAL HISTORY

On September 9, 2019, Plaintiff filed a Complaint against Defendant in the Superior Court of New Jersey, Law Division, Camden County. *See* Compl., attached to Notice of Removal as Ex. A (hereinafter "Compl."), ECF No. 1. On October 11, 2019, Defendant filed a timely Notice of Removal to the United States District Court for the District of New Jersey. ECF No. 1. Defendant filed an Answer on October 31, 2019. ECF No. 6. On May 18, 2020, the present case was designated and assigned to the Hon. C. Darnell Jones II of the United States District Court for the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 292(b). *See* Designation of District Judge for Service in Another District Within the Circuit, ECF No. 16.

Upon completion of discovery, Defendant filed the present Motion on June 25, 2021. ECF No. 24. Therein, Defendant argues that Plaintiff's harassment claim is meritless because the

---

[8] Although Plaintiff disputes this fact, it is admitted insofar as it accurately states Ms. Din's testimony that Plaintiff's conduct was "repeated and unwanted."

comments directed at Plaintiff regarding his disability were insufficiently "severe or pervasive" to constitute a hostile workplace. Mot. 11–13. Further, Defendant alleges that Plaintiff was terminated based on legitimate, rather than discriminatory or retaliatory, reasons. Mot. 7, 14–15. Plaintiff submitted a Response on July 19, 2021, rebutting that there remain genuine issues of material facts regarding whether Plaintiff was harassed and terminated based on his disability. ECF No. 26. In response to Plaintiff's opposition, Defendant filed a Reply in Further Support of their Motion (hereinafter "Reply") on August 9, 2021. ECF No. 29. With these filings, Defendant's Motion is ripe for the Court's consideration.

## IV.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).  "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted).  Therefore, to defeat a motion for summary judgment, the non-movant must establish that the disputes are both: (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by

"showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To that end, however, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)) (internal quotation marks omitted). Instead, an affiant must set forth specific facts that reveal a genuine issue of material fact. *Id*.

A court must "view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003). However, if a party fails to properly address another party's assertion of fact, a court may consider the fact undisputed and grant summary judgment. *See* Fed. R. Civ. P. 56(e)(2)-(3); *see also Judge C. Darnell Jones II Chambers Policies and Procedures* (rev'd Feb. 23, 2022), http://www.paed.uscourts.gov/documents/procedures/jonpol.pdf ("The Court will not consider any description of a fact that is not supported by citation to the record. Statements of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements, such as the title of or numbered reference to a document, the name of a deponent and

the page(s) of the deponent's deposition, or the identity of an affidavit or declaration and the specific paragraph relied upon. Pinpoint citations are required.").

## V.      DISCUSSION

Defendant has moved for summary judgment, asking this Court to declare the following: (1) the record evidence refutes that Plaintiff's termination was pretext for disability discrimination; (2) even assuming the discriminatory comments alleged by Plaintiff were actually stated, the conduct does not rise to a level that was sufficiently "severe or pervasive" as required under the NJLAD; (3) there is insufficient evidence to show Plaintiff was terminated in retaliation for complaining to management concerning the comments made to him by his co-workers; and (4) if any of his claims survive summary judgment, Plaintiff's claim to punitive damages should be stricken. Mot. 1–2, 17. All of Plaintiff's claims are brought under the NJLAD; however, it is noteworthy that the "[a]nalysis of claims made pursuant to the NJLAD generally follows the analysis of Title VII claims." *Harris v. Holder*, No. 14-CV-5163, 2016 WL 3388297, at *3 (D.N.J. June 13, 2016) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999)); *see also Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir. 1995) ("In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well."). Accordingly, this Court will rely on Title VII and Americans with Disabilities Act (hereinafter "ADA") jurisprudence when appropriate in its analysis of Plaintiff's NJLAD claims.

### A. Plaintiff's Disability Discrimination Claim under the NJLAD

The NJLAD guarantees the right to obtain employment without discrimination based on numerous immutable characteristics, including disability. *See* N.J. Stat. Ann. § 10:5-4 (West 2017). The relevant law governing an action "seeking redress for an alleged violation of the LAD depends upon whether the employee attempt[s] to prove employment discrimination by . . . direct or circumstantial evidence." *Grande v. Saint Clare's Health Sys.*, 164 A.3d 1030, 1038 (N.J. 2017) (internal quotation omitted). Here, Plaintiff endeavors to prove his case through circumstantial evidence of discrimination.[9] Resp. 27–28. "To evaluate circumstantial evidence cases, [the New Jersey Supreme Court] has adopted the three-step burden-shifting test articulated" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–803 (1973). *Grande*, 164 A.3d at 1039. The first step of the burden-shifting analysis requires the plaintiff to establish a prima facie case. *Id.*; *see Jansen v. Food Circus Supermarkets*, 541 A.2d 682, 692 (N.J. 1988). "If a plaintiff successfully establishes a prima facie case, a presumption arises that the employer unlawfully discriminated against the plaintiff." *Grande*, 164 A.3d at 1039–40 (internal quotation omitted). The analysis then proceeds to its second step, where the employer has the burden of

---

[9] Although Plaintiff spends most of his argument on the circumstantial evidence analysis, he appears to allude that direct evidence of discrimination also exists. *See* Resp. 28 ("In reviewing the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) standard, the courts have also expanded the analysis to include a jury can find an adverse employment action is retaliatory in addition to defendant[']s proffered legitimate reasons for termination. This is commonly referred to as a "mixed motive."). This approach differs from *McDonnell Douglas* in that the employee must set forth "'more direct evidence' in a direct-evidence case than in a *McDonnell Douglas* case involving circumstantial evidence." *Smith v. Millville Rescue Squad*, 139 A.3d 1, 14 (N.J. 2016) (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir. 1995)); *see Bergen Com. Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999) ("In the context of a claim for wrongful discharge, an employee must show 'direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion' . . . in deciding to terminate his or her employment.") (quoting *Fischer v. Allied Signal Corp.*, 974 F. Supp. 797, 804 (D.N.J. 1997); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 230 (1989) (stating that when the employee presents "direct evidence that the employer placed substantial, though unquantifiable, reliance on a forbidden factor in making an employment decision" the employer is required to show that its decision "would have been justified by wholly legitimate concerns."). Here, Plaintiff does not attempt to explain what "direct evidence" of discrimination he seeks to rely upon for this argument, focusing instead on the *McDonnell Douglas* pretextual analysis, so this Court will do the same. *See* Resp. 33–35.

producing a non-discriminatory reason for the employee's discharge or demonstrating the reasonableness of the otherwise discriminatory act. *See id.* at 1040. Once the employer satisfies its burden, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see Grande*, 164 A.3d at 1040 ("The employee may respond by proving by a preponderance of the evidence that the reason proffered by the employer was not the true reason for the employment decision but was merely a pretext for discrimination." (internal quotation omitted)).

### 1. Prima Facie Case

To establish a prima facie case for an alleged wrongful termination, the plaintiff must demonstrate that: (1) he is disabled or perceived to be disabled within the meaning of the NJLAD;[10] (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was nevertheless fired; and (4) the employer sought someone else to perform the same work after he left. *See Grande*, 164 A.3d at 1039; *Jansen*, 541 A.2d at 692; *Ditzel v. Univ. of Med. and Dentistry of N.J.*, 962 F. Supp. 595, 603 (D.N.J. 1997); *Cotto v. Ardagh Glass Packing, Inc.*, No. 18-CV-1037, 2018 WL 3814278, at *4 (D.N.J. Aug. 10, 2018); *Sunkett v. Nat'l Gypsum Co.*, No. 09-CV-0721, 2011 WL 6719776, at *24–25 (D.N.J. Dec. 21, 2011); *Cummings v. Dep't of Hum. Servs.*, No. 18-CV-15255, 2022 WL 597058, at *13 (D.N.J. Feb. 28, 2022).

As the parties do not dispute the first three (3) elements of the prima facie case, the Court turns to the fourth prong, which requires "proof that the 'employer sought a replacement with

---

[10] "As to the first prong of the prima facie case, an employee who is perceived to have a disability is protected just as someone who actually has a disability." *Grande*, 164 A.3d at 1039. Since Defendant does not dispute that Plaintiff is disabled within the meaning of the NJLAD, the disability and perceived disability discrimination inquiries merge. Mot. 5–6.

qualifications similar to [the employee's] own, thus demonstrating a continued need for the same services and skills.'" *Grande*, 164 A.3d at 1039 (quoting *Bergen Com. Bank*, 723 A.2d at 959). However, the parties have not briefed the Court on this issue, and the Court's own review of the record could not find any evidence that Defendant sought to replace Plaintiff. Mot. 5–6; Resp. 26–27. However, construing the facts in the light most favorable to Plaintiff, the Court assumes that Plaintiff was likely replaced by someone with similar qualifications, thus meeting his burden at the prima facie stage.

### 2.  Second Step of *McDonnell Douglas*: Employer's Legitimate Reason for Termination

After the employee establishes a prima facie case, the burden shifts to the employer to either establish the reasonableness of the otherwise discriminatory act or articulate a legitimate, non-discriminatory reason for the employee's termination. *See Grande*, 164 A.3d at 1040; *Fuentes*, 32 F.3d at 763. Here, Defendant argues that Plaintiff was discharged for making inappropriate comments to Ms. Parker while already on a final written warning. Mot. 6–7. Because Defendant claims it has a non-discriminatory reason for the termination, its burden is one of production, not a burden of proof or persuasion. *See Grande*, 164 A.3d at 1040; *Fuentes*, 32 F.3d at 763. Defendant "satisfies its burden by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763 (describing the employer's burden at this stage as "relatively light").

Taking Defendant's proffered reasons as true, Defendant satisfies its burden as its articulated basis for termination—Plaintiff's alleged comments to Ms. Parker—is non-discriminatory, thus rebounding the burden back to Plaintiff.

**3. Third Step of McDonnell Douglas: Employee's Burden of Demonstrating Employer's Proffered Reasons were Pretext for Discrimination**

After a defendant proffers a legitimate, non-discriminatory reason for the plaintiff's termination, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Sheridan v. E.I. Dupont de Nemours and Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996) (quoting *Fuentes*, 32 F.3d at 764). Here, Plaintiff takes the first approach, disputing the truthfulness of Defendant's articulated reason. Resp. 27–30. To discredit Defendant's proffered reason, Plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (first quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen* 983 F.2d 509, 531 (3d Cir. 1992); then quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)). *Fuentes* describes this as placing a "difficult burden" on the plaintiff, *Id.*, and subsequent cases have explained that a plaintiff's burden is to "show not only that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Wilson v. Aerotek, Inc.*, 854 F. App'x 430, 434 (3d Cir. 2021) (internal quotation omitted).

Here, Plaintiff makes two (2) arguments to discredit Defendant's proffered reasons for termination. First, Plaintiff takes issue with Defendant's investigation into his remarks to Ms.

Parker, describing it as "beyond inadequate" and "targeted." Resp. 29 (internal quotation omitted). Second, Plaintiff pursues an inconsistent enforcement argument, alleging that Mr. Regan is a proper comparator who engaged in similar conduct as Plaintiff but received a milder disciplinary outcome. Resp. 29. Plaintiff argues that Defendant's inconsistent enforcement— firing Plaintiff but not Mr. Regan—is sufficient to discredit Defendant's proffered reason for his termination. Resp. 29; *see Fuentes*, 32 F.3d at 765. The Court will discuss each argument in turn.

### a.  Defendant's Investigation

First, the Court will consider the veracity of Defendant's investigation. Resp. 29. Specifically, Plaintiff alleges that (1) Defendant did not corroborate Ms. Parker's allegation that Plaintiff made the "awkward" comment, and (2) Ms. Din's finding that it was not possible for more than one person to have made the "awkward" comment demonstrates bias in her investigation. Resp. 29; Ex. B at 111:13–16. For the reasons set forth below, Plaintiff's reasoning fails.

"If an employer relies on statements and complaints by co-workers when making a decision to terminate an employee, the employee cannot later establish pretext by simply challenging the veracity of such statements. So long as the decision-maker reasonably credited the allegations, an employee's denial is not enough to establish pretext." *McCormick v. Allegheny Valley Sch.*, No. 06-CV-3332, 2008 WL 355617, at *43 (E.D. Pa. Feb. 6, 2008); *see Coulton v. Univ. of Pa.*, No. 05-CV-1446, 2006 WL 759701, at *26 (E.D. Pa. Mar. 22, 2006) ("The Court finds that Plaintiff is not entitled to an inference of discrimination because the [employer] believed the allegations against him.").

Defendant relied upon Ms. Parker's complaint when terminating Plaintiff. SMF ¶ 68; RSMF ¶ 68. Plaintiff does not produce—and the Court's review of the record fails to find—any

evidence suggesting that Ms. Parker was so unreliable of a source as to make it unreasonable for Defendant to rely on her complaint. Although Plaintiff argues that Defendant did not corroborate Ms. Parker's complaints, Resp. 29, he fails to demonstrate why Defendant was unreasonable for crediting her complaint without sufficient corroboration. Further, the statements Ms. Din gathered from co-workers during her investigation do not make Ms. Parker's complaint so outlandish as to make Defendant's reliance upon it unreasonable—if anything, these statements tend to support that Plaintiff commonly made these sorts of comments in the workplace. SMF ¶¶ 55–57; RSMF ¶ 55–57; Pl.'s Ex. G. As a result, the Court finds that Defendant reasonably relied on Ms. Parker's complaint when deciding to terminate Plaintiff, so any challenge to the veracity of her statements does not establish pretext.[11]

Finding that Defendant acted reasonably in crediting Ms. Parker's allegation, the next question is whether the subsequent investigation was so inadequate as to cause a reasonable jury to infer that Defendant did not act for its stated reasoning. Even if Defendant's investigation was inadequate, Plaintiff fails to provide any evidence that Defendant's articulated reason is false. Courts in the Third Circuit have consistently found that a merely inadequate or imperfect investigation is insufficient to support a finding of pretext. *See Geddis v. Univ. of Del.*, 40 F. App'x 650, 653 (3d Cir. 2002) ("[Plaintiff] argues that the [defendant] failed to adequately investigate the allegations against him and that it did so in violation of University policy. Again, the lack of investigation alone does not establish that the [defendant] fired [plaintiff] based on

---

[11] Defendant relied on the fact that Plaintiff was on a final written warning at the time of his alleged comments in deciding to terminate him. Reply 6; SMF ¶ 40; RSMF ¶ 40; Def.'s Ex. E. Although Plaintiff does not directly challenge the factual basis of the final written warning as evidence of pretext in his argument, he does dispute the accuracy of the final written warning's constitutive claims. RSMF ¶ 40. Even assuming the incidents constituting the final written warning are false, the relevant question is only whether Defendant reasonably relied on these statements in giving Plaintiff a final written warning. As the Court finds no evidence suggesting that it was unreasonable for Defendant to rely on these statements, any challenges to the accuracy of the statements in the final written warning cannot establish pretext. *See Mercer v. SEPTA*, 608 F. App'x 60, 65 (3d Cir. 2015) (stating that a plaintiff's disagreement with being on "Last Chance" status, without more, does not demonstrate pretext).

discriminatory reasons."); *Money v. Provident Mut. Life Ins. Co.*, 189 F. App'x 114, 116–17 (3d Cir. 1994) (finding that plaintiff's "naked credibility attack" on the investigation's sufficiency does not assist him in establishing pretext); *Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 768 (W.D. Pa. 2016) ("While evidence that an investigation was utterly foolish, biased, or unsubstantiated could be probative of a retaliatory motive, proof that it was imperfect, unwise, or inaccurate would not.") (citing *Fuentes*, 32 F.3d at 765 n.8); *Glenn v. Raymour and Flanigan*, 832 F. Supp. 2d 539, 553 (E.D. Pa. 2011) (finding that plaintiff's allegation that the defendant's investigation should have interviewed more witnesses and timely obtained witness statements is not evidence of pretext); *Bentley v. Millennium Healthcare Ctrs. II, LLC*, No. 06-CV-5939, 2009 WL 211653, at *9 (D.N.J. Jan. 21, 2009) ("[E]ven if [defendant's] entire investigation was inadequate, that fact alone would not be sufficient evidence to raise an inference of pretext."); *Thomas v. Fairmount Behav. Health Sys.*, No. 06-CV-523, 2007 WL 2306592, at *5 (E.D. Pa. Aug. 9, 2007) (stating that plaintiff's contention that the defendant did not conduct a "diligent investigation" is insufficient to establish pretext).

Here, Plaintiff fails to provide any evidence from which a rational factfinder would disbelieve Defendant's articulated reasoning for his termination. Instead, Plaintiff merely attacks Ms. Din's investigation, stating that she received "zero corroboration that Plaintiff made the 'awkward' remark to [Ms.] Parker." Resp. 29. Assuming *arguendo* that Ms. Din did not receive any corroboration for Parker's complaint, Plaintiff fails to demonstrate how this is anything more than an inadequate or imperfect investigation.

Further, Plaintiff contends that Ms. Din's testimony exemplifies her bias towards Plaintiff, specifically when she responded that, based on her findings, she believed it was not possible that more than one person could have made the "awkward" comment. Resp. 29; Ex. B at

111:13–16. However, as Ms. Din explicitly stated, her opinion was based on findings that came about as the result of interviewing employees throughout her investigation. Ex. B at 111:13–16. Ms. Din interviewed seven (7) employees, such as Ms. Roman who stated that she witnessed Plaintiff make "little comments like awkward" and "I have no idea what it means but I have heard it twice. As a lead, Danielle has come to me on a constant basis with concerns this is happening at least 3x per week." SMF ¶ 56; RSMF ¶ 56; Pl.'s Ex. G. Further, Ms. Rivera stated that "I have heard several weeks ago, someone saying Awkward out loud and most of the guys started to laugh. I didn't know who they were referring to." SMF ¶ 57; RSMF ¶ 57; Pl.'s Ex. G. Additionally, Ms. Sosnoski told Ms. Din that "[Plaintiff] is constantly making comments, stupid stuff out loud, awhile ago I was two minutes late and [Plaintiff] kept saying 2, 2, 2 when I would pass him." SMF ¶ 55; RSMF ¶ 55; Pl.'s Ex. G. Plaintiff fails to demonstrate that Ms. Din unreasonably relied upon these statements in forming her opinion that no one else could have made the "awkward" comment and, ultimately, to recommend Plaintiff's termination. *See McCormick*, 2008 WL 355617, at *43; *Coulton*, 2006 WL 759701, at *26. As a result, Ms. Din's testimony is not evidence of bias and does not establish pretext.

Because Plaintiff has failed to demonstrate that any part of Defendant's investigation permits a reasonable factfinder to disbelieve their articulated reasons, this argument fails to establish pretext.

### b.  Plaintiff's Inconsistent Enforcement Argument

Plaintiff's next argument is that Defendant's retention of Mr. Regan, despite also being on a final written warning and making inappropriate comments to Ms. Parker on the day in question, demonstrates sufficient evidence for a reasonable factfinder to disbelieve Defendant's asserted non-discriminatory reason for terminating Plaintiff. *See* Resp. 29–30; *Fuentes*, 32 F.3d

at 765. However, this argument also fails to establish pretext as Mr. Regan is an inadequate comparator.

A comparator must be "similarly situated" to the plaintiff, which requires that "the individuals with whom plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.'" *Dill v. Runyon*, No. 96-CV-3584, 1997 WL 164275, at *4 (E.D. Pa. April 2, 1997) (quoting *Anderson v. Haverford Coll.*, 868 F. Supp 741, 745 (E.D. Pa. 1994)); *see Carey v. Fed. Express Corp.*, 519 F. App'x 772, 776 (3d Cir. 2013) ("[E]xamples of disparate treatment need not be perfect replicas, but they must closely resemble one another in respect to relevant facts and circumstances." (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003))); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (4th Cir. 1994) ("In order for two or more employees to be considered similarly-situated...the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [female] employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances." (quoting *Ruth v. Child.'s Med. Ctr.*, No. 90-CV-4069, 1991 WL 151158, at *7 (6th Cir. Aug. 8, 1991)), *abrogated on other grounds* as stated in *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 609–10 (6th Cir. 2013)).

Mr. Regan is an inadequate comparator because his disciplinary history is sufficiently distinguished from Plaintiff's. It is undisputed that Plaintiff's final written warning was dated July 23, 2018—four (4) months before the incident with Ms. Parker—while Mr. Regan's final written warning was issued on May 12, 2016—two (2) and a half years before the incident with Ms. Parker. SMF ¶¶ 35–37, 47; RSMF ¶¶ 35–37, 47; *see* Laura Din's Email on Parker

Complaint, attached to Mot. as Ex. G and attached to Resp. as Ex. J. Dissimilar disciplinary

histories are sufficient to distinguish a potential comparator from a plaintiff seeking to establish

pretext. *See Feit v. Lehigh Univ.*, No. 19-CV-02336, 2021 WL 409971, at *22 (E.D. Pa. Feb. 5,

2021) ("Employees are similarly situated in all respects when they . . . have comparable violation

histories . . . ." (citing *Doe v. Apria Healthcare Grp., Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa.

2015))); *see also Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009); *Susko v.

Weidenhammer Sys. Corp.*, No. 20-CV-06543, 2021 WL 2451614, at *9 n.5 (E.D. Pa. June 16,

2021).

Besides similar disciplinary histories, "the plaintiff's conduct that drew the adverse

employment decision must have been 'nearly identical' to that of the proffered comparator who

allegedly drew dissimilar employment decisions." *Doe*, 97 F. Supp. 3d at 645 (quoting *Lee*, 574

F.3d at 260); *see Feit*, 2021 WL 409971, at *7 ("Employees are similarly situated in all respects

when they . . . engaged in 'nearly identical' conduct" (quoting *Doe*, 97 F. Supp. 3d at 645)).

Here, Ms. Parker's complaint alleges that Plaintiff's comments were "everyday" over the course

of multiple weeks, and Ms. Roman stated that "Danielle has come to me on a constant basis with

concerns this is happening at least 3x per week." Ex. I; Pl.'s Ex. G. Conversely, Mr. Regan had a

singular incident with Ms. Parker, Ex. I, and Ms. Din testified that this distinction was material

in deciding to interview Mr. Regan about the accusations against him but to not interview

Plaintiff. Din Dep. 111:21–112:21. Accordingly, as Plaintiff's conduct was repeated while Mr.

Regan's was an isolated incident, Plaintiff's conduct is not "nearly identical" to Mr. Regan's, so

their dissimilar employment actions cannot establish pretext. *See Doe*, 97 F. Supp. 3d at 645.

Plaintiff and Mr. Regan's relevant discipline histories and conduct are sufficiently

distinguished to render Mr. Regan an inadequate comparator. Thus, any alleged disparate

treatment of Mr. Regan does not create a reasonable inference that Defendant did not act for its asserted non-discriminatory reasoning, defeating Plaintiff's pretext argument. *See Fuentes*, 32 F.3d at 765.

Because both of Plaintiff's arguments for pretext fail individually and cumulatively[12] to demonstrate that Defendant's proffered reasons for termination were illegitimate, Defendant's Motion as to Plaintiff's discrimination claim (Count I) and perceived discrimination claim (Count II) must be granted.

## B. Plaintiff's Disability Harassment Claim Under the NJLAD

Plaintiff also argues that his co-workers' derogatory comments regarding his stutter constitute harassment under the NJLAD.[13] To sustain a disability harassment claim under the NJLAD, a plaintiff must establish that the defendant's conduct: (1) would not have occurred but for the employee's handicap; and the conduct was (2) severe or pervasive enough to make a (3) reasonable person with the plaintiff's disability believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. *See Ditzel*, 962 F. Supp. at 603 (citing *Lehmann*, 626 A.2d at 453; *see also Taylor*, 706 A.2d at 688–89 (stating that the court in *Lehman* adopted the basic standard for determining when "acts of harassment in the workplace constitute invidious discrimination" in violation of the NJLAD, specifically adopting the "severe or pervasive" standard from federal Title VII law). Since the first prong, causation, is not disputed in this case, the central focus is whether the comments directed at Plaintiff were

---

[12] The Court also notes that it is undisputed that Plaintiff suffered from a stuttering condition when Defendant hired him, and that Plaintiff's stutter was apparent to Defendant's management team. SMF ¶¶ 7, 9; RSMF ¶¶ 7, 9; CMF ¶¶ 6–7; RCMF ¶¶ 6–7. These facts tend to support the notion that Plaintiff's termination was not pretextual, since "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1267 n.24 (D.N.J. 1994).

[13] New Jersey courts describe this claim as both a "harassment" and a "hostile work environment" claim, using the terms interchangeably. *See Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 453–54 (N.J. 1993); *Taylor v. Metzger*, 706 A.2d 685, 688–89 (N.J. 1998). As the parties briefed this claim as "harassment," Mot. 10–11; Resp. 30, the Court will refer to the same.

sufficiently severe or pervasive as to cause a reasonable person with a stutter to believe that the conditions of employment are altered so that the working environment is hostile or abusive. *See Ditzel*, 962 F. Supp. at 603.

Plaintiff does not need to establish both severity and pervasiveness, because "[t]he disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Clem v. Case Pork Roll Co.*, No. 15-CV-6809, 2016 WL 3912021, at *6 (D.N.J. July 18, 2016) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006)); *see Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 22–23 (1993) (stating that hostile work environment claims must be considered holistically by looking at factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.").

While repeated offensive remarks by a supervisor regarding a plaintiff's stutter may be immature and insensitive, they do not rise to the level of "severe or pervasive" disability harassment. *See Medvic v. Compass Sign Co.*, No. 10-CV-5222, 2011 WL 3513499, at *11–12 (E.D. Pa. Aug. 10, 2011).[14] In *Medvic*, a plaintiff with a stuttering condition asserted that his supervisor repeatedly made statements to him such as "spit it out" and "hurry up" when he was talking. *Id.* at 11. Further, on one occasion, his supervisor and the company's owner asked him to

---

[14] Although *Medvic* is an ADA harassment case, the NJLAD uses the same standard to decide harassment cases. *See Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 941 (3d Cir. 2009) ("New Jersey courts treat hostile work environment claims under the NJLAD the same as the Supreme Court treats hostile work environment claims under Title VII."); *Newman*, 60 F.3d at 157 ("In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well."); *Medvic*, 2011 WL 3513499, at *12 n.23 (stating that courts in the Third Circuit analyze hostile work environment claims under the ADA using Title VII jurisprudence). Since the standards between the three statutes inform each other, *Medvic* is an instructive case to apply here.

"sing." *Id.* Despite noting that the remarks were "immature and insensitive," the court found that these incidents were merely offensive utterances, not actionable harassment. *Id.* at 12. In reaching this conclusion, the court noted that the "abusive working environment" requirement is meant to ensure that harassment claims "do not turn the ADA into a general civility code, and ensures that only behavior that is 'so objectively hostile as to alter the terms and conditions of ones employment' will be actionable." *Id.* (quoting *Harris*, 510 U.S. at 21).

Here, the comments directed at Plaintiff—although certainly insensitive and derogatory—do not rise to the level of severity or pervasiveness to be actionable under the NJLAD. The case at bar is analogous to *Medvic* in significant respects. First, the nature of the comments is strikingly similar, as Plaintiff was also told to "hurry up" while stuttering. *See* SMF ¶ 15; RSMF ¶ 15; CMF ¶¶ 13–14; RCMF ¶¶ 13–14; *Medvic*, 2011 WL 3513499, at *11. Besides the similar "hurry up" comment, the remaining three (3) incidents are of comparable severity as those in *Medvic*.[15] Here, Plaintiff was asked by a co-worker whether he got picked on a lot as a kid, and when he responded in the affirmative, he was told that it "must come with the territory." SMF ¶ 14; RSMF ¶ 14; CMF ¶¶ 16–17; RCMF ¶¶ 16–17. On another occasion, a co-worker commented that Plaintiff should read the "safety topic for that week" during a meeting, to which another co-worker responded saying, "Yeah, we should make [Plaintiff] read it so it takes us all day and we don't have to do any work this whole day . . . That will take us until 2:30." SMF ¶¶ 19–20; RSMF ¶¶ 19–20; CMF ¶¶18–19; RCMF ¶¶ 18–19. In a fourth incident, a co-worker told Plaintiff that he was applying to a job posting, leading Plaintiff to ask what the job was and

---

[15] The Court recognizes that Plaintiff alleges to have suffered "no less than seven [(7)] harassing comments" during his tenure at Defendant. Resp. 32. However, Plaintiff fails to explain the nature of these comments with sufficient particularity for the Court to analyze their severity or pervasiveness. Specifically, it is unclear if these additional comments occurred within the four (4) broader incidents that the parties agree on, or if these are additional incidents of alleged harassment. Because Plaintiff has failed to describe these assertions even after the benefit of discovery, the Court's analysis will proceed considering only the four (4) specific instances of alleged harassment.

where he could apply for it. SMF ¶¶ 29–30; RSMF ¶¶ 29–30. The co-worker responded, telling

Plaintiff "not to bother" applying "cause it would require speaking to customers over the phone."

SMF ¶¶ 29–31; RSMF ¶¶ 29–31. Another co-worker, overhearing the conversation, added that

"[y]ou don't want to put yourself through that, Brian" SMF ¶ 32; RSMF ¶ 32.

These incidents, like those in *Medvic*, are "merely offensive" comments which do not

constitute a hostile work environment under the NJLAD. *See Velcko v. Saker Shoprites, Inc.*, No.

15-CV-1217, 2016 WL 4728106, at *5 (D.N.J. Sep. 9, 2016) ("'[S]imple teasing,' offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the 'terms and conditions' on employment." (quoting *Heitzman v. Monmouth Cnty.*,

728 A.2d 297, 304 (N.J. Super. Ct. App. Div. 1999))); *Carrol v. Sunrise Detox Cherry Hill,*

*LLC.*, No. 19-17287, 2020 WL 4218409, at *8 (D.N.J.) ("The 'mere utterance of an epithet

which engenders offensive feelings in an employee does not sufficiently affect the conditions of

employment to implicate Title VII' or the NJLAD." (quoting *Sanchez v. Sungard Availability*

*Servs.*, 362 F. App'x 283, 286–87 (3d Cir. 2010))). The comments at issue here are undoubtedly

insensitive and unacceptable but are insufficiently severe to affect the conditions of employment.

*See Carrol*, 2020 WL 4218409, at *8. Like *Medvic*, defining these comments as actionable

"harassment" under the NJLAD would be to effectively implement a "general civility code" for

conduct in the workplace, which is not the goal of the NJLAD. *See Velcko*, 2016 WL 4728106,

at *5 ("The NJLAD is not intended to be a general civility code for conduct in the workplace . . .

Discourtesy or rudeness should not be confused with . . . harassment." (internal quotations

omitted)).

In addition to the comments being of similar severity, *Medvic*'s comments were made by

supervisors and the owner of his company—while no supervisors made derogatory comments

here—which is a distinction that counsels in favor of granting summary judgment. *See Medvic*, 2011 WL 3513499, at *11. It has been well-recognized that derogatory comments made by a supervisor—much less the owner of the company to whom the plaintiff is employed—are more likely to constitute a hostile workplace. *See Gavin v. Haworth, Inc.*, No. 15-CV-180, 2016 WL 7325474, at *9 (D.N.J. Dec. 16, 2016) ("When an act is done by a supervisor, its severity may be exacerbated because the supervisor has a unique role in shaping the work environment."); *Leonard v. Metro. Life Ins. Co.*, 723 A.2d 1007, 1009 (N.J. Super. Ct. App. Div. 1999) ("[T]he severity of the remarks was underscored by the fact that they were uttered by plaintiff's supervisor, who has a unique role 'in shaping the work environment' and preventing and rectifying invidious harassment in the workplace." (quoting *Taylor*, 706 A.2d at 691)). By contrast, the comments at issue here were all made by non-supervisory distribution clerks, the same position as Plaintiff. SMF ¶¶ 14–15, 29, 32; RSMF ¶¶ 14–15, 29, 32; CMF ¶¶ 13–17; RCMF ¶¶ 13–17. Since *Medvic* failed to find a hostile work environment when supervisors made the derogatory remarks, it follows that the absence of such an aggravating circumstance advises in favor of granting summary judgment here.

*Medvic* and this case are also distinguished because *Medvic* concerned "repeated" derogatory comments while this case only involved four incidents of insensitive remarks.[16] *See Medvic*, 2011 WL 3513499, at *11 ("Plaintiff has asserted that his supervisor, Buechner, *repeatedly* said statements to him such as "spit it out" and "hurry up" when he was talking." (emphasis added)); SMF ¶¶ 14–15, 19–20, 29–32, 60; RSMF ¶¶ 14–15, 19–20, 29–32, 60; CMF ¶ 11; RCMF ¶ 11. Although *Medvic* does not clarify how repetitious the supervisor's comments

---

[16] The Court again notes that Plaintiff alleges seven (7) harassing comments, rather than four (4) incidents of alleged harassment. For the reasons stated above, the Court is only considering the four (4) instances of alleged harassment which the Court has been adequately informed of. *See supra* note 15.

were in that case,[17] a survey of Third Circuit precedent demonstrates that the comments here were not pervasive.[18] *See Bacone v. Phila. Hous. Auth.*, 112 F. App'x 127, 129 (3d Cir. 2004) ("The behavior at issue involved no more than four incidents during the span of two weeks, and though they were offensive, they are not pervasive enough [to] rise to the level of a Title VII violation."); *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 664, 671 n.4 (3d Cir. 1999) (finding that five incidents over a four-year employment period was not pervasive); *Ballard-Carter v. Vanguard Grp.*, 703 F. App'x 149, 152 (3d Cir. 2017) (finding that four incidents over a three-year period was not pervasive). Here, Plaintiff experienced four (4) incidents over an employment period of over three and a half years—where the incidents were clustered around a one-year period at the end of his tenure. SMF ¶¶ 4, 8, 14, 60; RSMF ¶¶ 4, 8, 14, 60; CMF ¶ 11; RCMF ¶ 11. Because of the infrequent nature of these incidents, Plaintiff's case is insufficiently pervasive to constitute a hostile work environment under the NJLAD.  Thus, summary judgment must be granted for Plaintiff's harassment claim (Count III).

### C.  Plaintiff's Retaliation Claim under the NJLAD

Plaintiff's Complaint further asserts a retaliation claim under the NJLAD, arguing that he was terminated for complaining to Defendant about his co-workers' derogatory comments. *See* Resp. 34–35. "To establish a prima facie case of retaliation, an employee must show by a

---

[17] The Court reasons that *Medvic* had a higher frequency of offensive comments over the plaintiff's tenure than the frequency represented here. In *Medvic*, the supervisor's "repeated" remarks, *see Medvic*, 2011 WL 3513499, at *11, must account for at least three incidents of derogatory comments, since if it were two or less, it could not logically be said to be "repeated" conduct. Because the *Medvic* court also notes that the plaintiff's co-workers asked him to "sing" on one occasion, *id.*, the minimal number of incidents which *Medvic* could have represented is four (4). Comparing that frequency to the one relevant here, *Medvic* concerned four incidents over an employment period of a year and seven (7) months, *see Medvic*, 2011 WL 3513499, at *1, 11, while this case involved four incidents over an employment period of over three and a half years. *See* SMF ¶¶ 4, 8, 14, 60; RSMF ¶¶ 4, 8, 14, 60; CMF ¶ 11; RCMF ¶ 11. Accordingly, *Medvic*'s comments were more frequent than here, which favors granting the pending motion.
[18] The Court notes that Plaintiff merely cites a dissenting opinion from a New Jersey appellate court in support of his claim that a reasonable jury could find that the incidents here are sufficiently pervasive. *See* Resp. 32. In light of Third Circuit precedent and *Medvic*, the Court finds Plaintiff's legal support inadequate and unpersuasive.

preponderance of the evidence that (1) he or she 'engaged in a protected activity known to the employer;' (2) he or she thereafter was 'subjected to [an] adverse employment decision by the employer;' and (3) there was a 'causal link' between the protected activity and adverse employment decision." *Delli Santi v. CAN Ins. Cos.*, 88 F.3d 192, 198–99 (3d Cir. 1996) (citing *Jamison v. Rockaway Tp. Bd. of Educ.*, 577 A.2d 177, 182 (N.J. Super. Ct. App. Div. 1990)); *see also Wrighton v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1354 (9th Cir. 1984). If the employee establishes a prima facie case, a similar burden-shifting mechanism is employed as that used for a discrimination claim at summary judgment. *See Lombardi v. Cosgrove*, 7 F. Supp. 2d 481, 497 (D.N.J. 1997); *Delli Santi*, 88 F.3d at 198–99; *Mentor v. Hillside Bd. of Educ.*, No. 08-CV-1173, 2009 WL 2413636, at *5 (D.N.J. Aug. 5, 2009); *Jamison*, 577 A.2d at 182; *see Shepherd v. Hunterdon*, 765 A.2d 217, 230 (N.J. Super. Ct. App. Div. 2001); *Wrighton*, 726 F.2d at 1354.

## I.   Prima Facie Case

As the parties do not dispute that Plaintiff satisfies the first two (2) elements of the prima facie case, the question before the Court is whether there is a sufficient causal connection between the protected activity—complaining of alleged workplace harassment—and Plaintiff's termination. Mot. 14–15; Resp. 34.

Causation can be demonstrated through various types of evidence, but many cases have focused on temporal proximity between the protected activity and the adverse employment action because it is often "an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that the protected activity was the likely reason for the adverse action." *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (internal quotation omitted); *see LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) ("Where the temporal proximity between the protected activity and the adverse action is

'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001))).

Here, the temporal proximity between Plaintiff's last complaint and his termination was five (5) months,[19] CMF ¶ 47; RCMF ¶ 47; SMF ¶ 60; RSMF ¶60, which the Third Circuit does not consider "unusually suggestive" of retaliation to establish causation. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (finding that where two (2) months elapsed between the protected activity and termination, temporal proximity was insufficiently suggestive of retaliation); *LeBoon,* 503 F.3d at 232–33 (determining that three (3) months between plaintiff's complaint and termination was insufficient to establish temporal proximity); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (concluding that a five-month period between a complaint and first adverse action was insufficient to establish temporal proximity*)*. *But see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding sufficient temporal proximity to infer causation when two (2) days passed between protected activity—employer being notified of EEOC claim—and employee's discharge). Because of this, the Court must consider if Plaintiff can establish causation through a holistic review of the record.

"Where the temporal proximity is not unusually suggestive, we ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference." *LeBoon*, 503 F.3d at 232 (internal quotation omitted).  This includes evidence of "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.* at 232–33.

---

[19] *See supra* note 3 for an explanation as to why the temporal proximity is five (5) months between Plaintiff's last protected activity and his termination.

Plaintiff first proffers that a reasonable jury could find a causal connection between the last complaint and Plaintiff's termination, "especially because Plaintiff did not have any potential issues between his last complaint and the alleged complaint by Parker." Resp. 35. Essentially, Plaintiff argues that because he did not have any disciplinary issues between his last complaint and Ms. Parker's complaint against him, this raises an "inference of retaliatory animus." *LeBoon*, 503 F.3d at 232. Assuming this timeline is accurate, the Court fails to understand how this raises an inference of retaliation. Adopting Plaintiff's timeline: Plaintiff was given his final written warning on July 23, 2018, SMF ¶¶ 35–38; RSMF ¶¶ 35–38, made his last complaint on or around July 26, 2018, CMF ¶ 47; RCMF ¶ 47, Ms. Parker made her complaint on November 29, 2018, SMF ¶ 47; RSMF ¶ 47, and Plaintiff was terminated on December 4, 2018. SMF ¶ 60, RSMF ¶ 60. Despite what Plaintiff suggests, this timeline does not create a reasonable inference of retaliation because Plaintiff was already on a final written warning *before* both his and Ms. Parker's complaint. It was not until Ms. Parker made her complaint on November 29 that Plaintiff was terminated on December 4. SMF ¶¶ 47, 60; RSMF ¶¶47, 60. Viewing these facts holistically, Plaintiff's complaint from 5 months prior to termination does not support an inference of retaliation when he was terminated a mere 5 days after Ms. Parker's complaint.

In addition to his concerns over his termination timeline, Plaintiff states that "Castaneda was aware of Plaintiff's harassment complaint, did not take any action, and was in contact with Din while she 'investigated' Parker's claims." Resp. 35. Further, Plaintiff states that during this same time, Ms. Din made "unfounded assertions" about Plaintiff prior to engaging in a full investigation. Resp. 35–36. Based on these facts, Plaintiff argues a reasonable jury could infer retaliatory animus. However, Plaintiff's argument falls short of establishing this conclusion. Importantly, although Ms. Castaneda was aware of Plaintiff's harassment complaint—as he

directly complained to her over the phone—Plaintiff proffers no evidence that Ms. Din was made aware of his complaint at any point during her investigation. Though Plaintiff assumes Ms. Castaneda was "in contact" with Ms. Din during her investigation, discovery has failed to reveal that these communications occurred. Regarding Plaintiff's accusation that Ms. Din made "unfounded assertions" about Plaintiff prior to the investigation, Plaintiff is likely referencing Ms. Din's email to Ms. Castaneda on the day Ms. Parker complained of Plaintiff's comments. Resp. 36; Ex. B at 117–122; Ex. J. In that email, Ms. Din tells Ms. Castaneda "I will obviously do a proper fact-finding but in my mind [Plaintiff] is a *recurring problem* in this facility. If he is on a FWW, I would like to move forward with a termination." Ex. J (emphasis added); *see* Ex. B at 20:4–24. Even if Ms. Din's opinion about Plaintiff being a "recurring problem" was unfounded, it is ultimately immaterial as Plaintiff provides no evidence to suggest that her decision to recommend termination was in any way connected to his harassment complaints. Without such evidence, the Court struggles to find any reasonable basis for a jury to infer retaliatory animus. Unable to establish causation, Plaintiff fails to present a prima facie case of retaliation.

## II.   Burden-Shifting Analysis

Assuming *arguendo* that Plaintiff could establish a prima facie case of retaliation, however, his retaliation claim would still fail as he fails to show that Defendant's proffered reason for termination is pretext for retaliation. Although neither party briefs any component of the burden-shifting analysis for the retaliation claim, the first step of the analysis is like his discrimination claim, as it asks the employer to proffer a legitimate, non-retaliatory reason for termination. *See Lombardi*, 7 F. Supp. 2d at 497; *Delli Santi*, 88 F.3d at 198–99*; Romano v. Brown & Williamson Tobacco Corp.*, 665 A.2d 1139, 1142–43 (N.J. Super. App. Div. 1995).

This legitimate reason is the same reason given in the discrimination claim, that Plaintiff was fired for making inappropriate comments to Ms. Parker while on a final written warning. Mot. 7. Because the Court concluded that was a legitimate reason in the discrimination context, it follows that it would be sufficient within the retaliation context as well. Next, the burden shifts back to Plaintiff to "show by a preponderance of the evidence that a discriminatory intent motivated the employer's decision." *Delli Santi*, 88 F.3d at 199. At summary judgment, Plaintiff accomplishes this rebuttal by pointing

> to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.... [T]he non-moving party must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence."

*Lombardi*, 7 F. Supp. 2d at 497 (quoting *Romano*, 665 A.2d at 1142–43); *see also Fuentes*, 32 F.3d at 765.

Here, Plaintiff proffers no evidence from which a reasonable factfinder could either disbelieve Defendant's articulated reason or believe a retaliatory reason was more likely than not a motivating or determinative cause of Defendant's action. Simply, without producing any evidence that Ms. Din was aware that Plaintiff partook in a protected activity, i.e. making a complaint, there is no basis for a reasonable factfinder to find Defendant's stated reasoning "unworthy of credence" or otherwise raise a genuine issue of material fact regarding Defendant's motive. *See Lombardi*, 7 F. Supp. 2d at 497; *Romano*, 665 A.2d at 1143. Thus, even if Plaintiff could establish a prima facie case for retaliation, a conclusion this Court does not support, his

retaliation claim would still fail as he cannot establish pretext. Without such, Defendant's motion for summary judgment as to Plaintiff's retaliation claim (Count IV) is granted accordingly.[20]

## VI.   CONCLUSION

Because Plaintiff, even after the benefit of discovery, has failed to present sufficient evidence to demonstrate a genuine issue of material fact for any of his claims, Defendant's Motion for Summary Judgment must be granted in its entirety.

An appropriate order follows.

---

[20] Defendant also moved for summary judgment on the issue of punitive damages. Mot. 26–27. As the Court has granted summary judgment for all of Plaintiff's underlying claims, the issue of punitive damages is moot.